UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MIKE KASTRATI,

                          Plaintiff,

           - against -

M.E.G. RESTAURANT ENTERPRISES LTD. d/b/a
NOVITA RESTAURANT, MARCO FREGONESE, and
ELIZABETH YOSHIDA,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

COMPLAINT AND
PETITION

PLAINTIFF DEMANDS
<u>A TRIAL BY JURY</u>

Plaintiff Mike Kastrati ("Kastrati" or "plaintiff"), by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants M. E. G. Restaurant Enterprises Ltd. d/b/a Novita Restaurant ("Novita" or "the Restaurant"), Marco Fregonese ("Fregonese"), and Elizabeth Yoshida ("Yoshida") (collectively, "defendants") as follows:

<u>NATURE OF THE ACTION</u>

1.      In 1996, Kastrati, who is Albian, fled the ethnic conflict in Kosovo. Kastrati has made a better life for himself in the United States. His success in the United States is largely attributable to his hard work for Novita, an Italian restaurant in Manhattan. Novita hired Kastrati as a waiter in 2006.

2.      By 2018, Kastrati had worked his way up to manager of Novita and purchased 20 percent of the Restaurant's shares. Consistent with the arrangement Kastrati made when he purchased his shares, Kastrati expected that he would have continued employment as a manager of the Restaurant.

3.      After Kastrati received his promotion to manager, however, Fregonese and Yoshida, co-owners and managing partners of Novita who together owned a majority of Novita's

shares, commenced a campaign of discrimination and harassment against Kastrati because he is Albanian and not Italian. Among many other examples, Fregonese pressured Kastrati to change his first name from "Muhamet," which is Muslim, to "Mike," purportedly to avoid problems with Novita's Jewish landlord. On multiple occasions, Yoshida criticized Kastrati because he was not Italian, did not understand Italian culture, and did not look Italian. She also frequently made negative remarks about Kastrati's "nasty" Eastern European accent.

4.      No one was safe from the discrimination. Other non-Italian employees, including other Albanian employees, experienced similar mistreatment. Moreover, Yoshida made derogatory comments about customers, describing some as "creepy Jews" and others as "old farts."

5.      In addition, since Kastrati purchased his shares in the Restaurant, Fregonese and Yoshida refused Kastrati access to Novita's financial records to which Kastrati is entitled as a minority owner. Instead, Fregonese and Yoshida have only allowed Kastrati to review profit and loss statements that they have created. Fregonese and Yoshida's accounting of the Restaurant's finances regularly include inexplicable expenses and, on information and belief, dramatically underreported Novita's revenue.

6.      When Kastrati complained about defendants' unlawful conduct, defendants retaliated against him by demoting him from manager to host, by cutting his responsibilities, and by making false allegations against him and threatening to sue him. On April 3, 2019, one month after Kastrati complained about discrimination, defendants fired him. Defendants replaced Kastrati as manager with an Italian man.

7.      Plaintiff brings this action to remedy discrimination on the basis of his race and retaliation in opposition to unlawful practices, in violation of Section 1981 of the Civil Rights Act of 1966, 422 U.S.C. §1981 ("Section 1981").

2

8.    Plaintiff also brings this action to remedy discrimination on the basis of his race, national origin and retaliation for opposition to unlawful practices in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

9.    Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief pursuant to Title VII, Section 1981, NYSHRL and NYCHRL.

10.    In addition, plaintiff brings this proceeding for judicial dissolution of Novita pursuant to New York Business Corporation Law ("BCL") § 1104-a(a)(1) on account of the oppressive conduct of the co-owners of Novita, Fregonese and Yoshida, towards Kastrati, a minority shareholder.

<u>JURISDICTION AND VENUE</u>

11.    Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343(a).

12.    Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because Novita operates in New York City, New York; Fregonese and Yoshida reside in New York City, New York; Kastrati worked for Novita in New York City, New York at all relevant times, and a substantial part of the events or omissions giving rise to these claims occurred within this district.

13.    This Court has supplemental jurisdiction over plaintiff's claims under the Executive Law, the City Law, and BCL § 1104-a(a)(1) pursuant to 28 U.S.C. § 1367 because these claims closely relate to the federal claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

14.     Pursuant to § 8-502(c) of the City Law, plaintiff will serve a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## THE PARTIES

15.     Kastrati is a citizen of New York State who worked for Novita until defendants fired him on April 3, 2019.  Kastrati  currently owns 20 percent of Novita's shares.  At all relevant times, Kastrati worked for defendants in New York City.

16.     Novita is a restaurant located and registered in New York, New York. It commenced operations in November 1994.

17.     The Restaurant is a closely held corporation. It is not registered as an investment company under an act of Congress entitled "Investment Company Act of 1940."

18.     Novita is an employer within the meaning of the Executive Law and the City Law.

19.     Fregonese and Yoshida are co-owners and partners of Novita. They reside and work in New York City, New York.

20.     As owners and managing partners of Novita, Fregonese and Yoshida are liable as employers. Fregonese and Yoshida are also liable as aiders and abettors, including for aiding and abetting Novita's unlawful acts.

## BACKGROUND

### Kastrati's Life in Kosovo

21.     Kastrati was born in what is now known as the country of Kosovo and is of Albanian ancestry.  Kastrati lived in Kosovo until 1996 when he fled to the United States due to

1141505 v1

an escalating ethnic conflict that the Serbian-led government and military waged against Albanians living in Kosovo.

22.    The conflict began to escalate when Kastrati was in high school. Among many other examples, the Serbian-led government closed all Albanian-language schools. Kastrati completed high school and two years of a degree in English language by attending school at private residences where teachers educated Albanian students in secret. The conditions were dangerous and the consequences of the Serbian forces catching students or teachers at these schools were severe.

23.    The Serbian-led government also attempted to force all young Albanian men into the Serbian army through compulsory military service. Kastrati could not fight for the Serbian army that was persecuting other Albanians. To avoid military service, Kastrati hid by sleeping in different places almost nightly.

24.    Before Kastrati left for the United States, the Serbian forces murdered many of his friends using poison and other means.

25.    In 1996, Kastrati escaped to the United States with a ferocious war in Kosovo on the horizon. Kastrati was 24 years old. Shortly after he left, the Serbian forces engaged in a campaign of ethnic cleansing to remove Albanians living in Kosovo. Between approximately 1998 and 2000, Serbian forces systematically murdered military-aged Albanian men, raped Albanian women, and forced Albanians to leave Kosovo.

<u>Kastrati's Life in the United States</u>

26.    Kastrati's time in the United States has diverged significantly from the life he left behind in Kosovo.

1141505 v1

27.     Kastrati is currently married and has two daughters.  His oldest daughter graduated college and received a Fulbright Scholarship. As part of her Fulbright scholarship, Kastrati's daughter teaches English in Kosovo.

28.     In 1997, Kastrati completed a one-year computer program and received a certificate from the Globe Institute of Technology.

29.     Between 2012 and 2013, Kastrati completed a year at Kingsborough Community College.  In 2013, Kastrati transferred to Baruch College.  In 2017, Kastrati received a Bachelor of Business Administration degree in finance from Baruch College.

30.     Since coming to the United States, Kastrati has worked as a waiter and a bartender at several restaurants.  For example, between approximately 1999 and 2001, Kastrati worked at the Tribeca restaurant Gubbio.  Also, between 2001 and 2006, Kastrati worked at the Long Island restaurant Stresa East.

### Initial Employment at Novita

31.     In 2006, Kastrati began working at Novita, a popular Italian restaurant.

32.     Novita is located in Manhattan.  Novita employs approximately 30 employees.

33.     On information and belief, Novita has enjoyed considerable success since it opened in 1994.

34.     When Kastrati joined Novita, the principal owner of Novita was Fregonese. Fregonese is an Italian man in his late 50s and serves as head chef of Novita.

35.     Fregonese's romantic partner, Yoshida, also owns shares in the restaurant. Yoshida, who was born in the United States, spends a lot of time at Novita having dinner with friends.

36.    Between 2006 and 2018, Kastrati was a waiter at Novita.  During this time, he primarily reported to Giuseppe Delpiano ("Delpiano").  Delpiano was a manager at the restaurant.  Delpiano, who was born in Italy, also owned shares in the restaurant.  Kastrati had worked with Delpiano previously at other restaurants and he was responsible for bringing Kastrati to Novita.

37.    On occasion, Kastrati filled in as manager for Delpiano when he was not at work.

38.    For those 12 years between 2006 and 2018, Kastrati consistently received positive feedback about his performance, got along well with other staff, and developed strong relationships with customers.

<u>Promotion to Manager and Share Purchases</u>

39.    In 2017, Kastrati received his finance degree from Baruch college.  In March 2017, Kastrati also received an entry level job offer as a Financial Representative for Foresters Financial Services.  Kastrati accepted the position, but then gave up the job after Delpiano convinced him to remain working at Novita.  Delpiano told Kastrati that he planned to relocate to Cuba.  He told Kastrati that, when he moved, Kastrati would have an opportunity to become manager and purchase his shares in the restaurant.

40.    In July 2018, Delpiano left Novita.  When Delpiano left, Kastrati purchased his shares in Novita pursuant to an agreement dated July 6, 2018,a copy of which is attached hereto as Exhibit A.  Currently, the Novita shares are allocated as follows:  Fregonese owns 57.5 percent of the shares; Yoshida owns 22.5 percent of the shares; and Kastrati owns 20 percent of the shares.

41.    When Kastrati purchased the shares, consistent with the arrangement that he made with Delpiano, which Fregonese approved, the restaurant promoted him to manager.  As

manager, Kastrati continued to work diligently.  Kastrati worked six days per week from 4:00

p.m.until midnight.  In or around early 2019, Kastrati began arriving earlier between 2:00 p.m. and

3:00 p.m.  Novita paid Kastrati $1,200 per week.  Kastrati received an additional payment each

month instead of health insurance in the amount of approximately $750.

42.    In addition to Kastrati shifts working in the restaurant, he answered phone

calls for the restaurant from home on Saturdays and Sundays.  Novita paid Kastrati an additional

$80 per day for doing so.

43.    Business at Novita began to improve soon after Kastrati became manager.

Average sales increased around 12 percent and the restaurant rating on OpenTable increased from

4.5 to between 4.7 and 4.8 out of 5.[1]  The improvement doubtlessly followed from Kastrati's hard

work.  For instance, Kastrati updated the lunch and dinner menus, the takeout menu, and the

Valentine's Day wine menu.  Kastrati wrote descriptions of all the wine on the wine list so that the

staff could describe the options to customers.  During Kastrati's tenure as manager, he also helped

decrease expenses each month.

<u>Kastrati Was an Employee of Novita</u>

44.    While Kastrati owns shares in Novita, he was an employee at all times

during his tenure.

45.    Since Kastrati became a shareholder in 2018, Fregonese and Yoshida were

managing partners and made all important decisions about the Restaurant.

46.    For example, Fregonese and Yoshida controlled virtually all aspects of

Kastrati's employment as a manager.  They set his work schedule and determined his salary and

other compensation.  In addition, as set forth below, after Kastrati complained about unlawful

---

[1] OpenTable is a website that allows patrons to review restaurants and make reservations.

1141505 v1

discrimination, Fregonese and Yoshida demoted Kastrati from manager to host and then fired him from Novita.

47.     Also, Fregonese and Yoshida controlled and limited Kastrati's access to the Restaurant's confidential records despite his repeated requests to review them.  In particular, Kastrati did not have access to the financial records of Novita.  As a shareholder, Kastrati received monthly profit and loss statements.  Fregonese and Yoshida, however, refused to show Kastrati any of the underlying materials.

48.     Fregonese and Kastrati met monthly to talk about the finances of the Restaurant.  Fregonese, however, excluded Kastrati from the process of determining profits and losses.  The calculations he ultimately provided to Kastrati often seemed inaccurate.  Whenever Kastrati asked to see the materials supporting these calculations, Fregonese became angry.  As a result, Kastrati stopped asking him for those materials.

49.     Even after Novita promoted Kastrati to manager, Fregonese and Yoshida never sought his input in making staff decisions, including hiring determinations.  For example, on or about February 10, 2019, Yoshida hired an Italian man whom Kastrati had never met, as a waiter.  Also, on March 2, 2019, a new busser arrived at the restaurant.  Fregonese and Yoshida had hired him without informing Kastrati.  In addition, on March 11, 2019, a new waiter began training at Novita.  Fregonese and Yoshida did not consult Kastrati before hiring him.

50.     Likewise, Kastrati was not involved in the decision to fire employees. Fregonese and Yoshida repeatedly made those determinations without Kastrati's participation.  For example:

    a.     On January 28, 2019, Fregonese and Yoshida directed Kastrati to fire Kastrati's nephew, a waiter, and another employee who worked in the

1141505 v1

coat check room.  Both employees are Albanian.  Kastrati objected to firing his nephew but Fregonese and Yoshida insisted that Kastrati tell his nephew that the Restaurant was firing him.

b.   In March 2019, Fregonese and Yoshida fired a busser from Mexico without consulting Kastrati or informing him.  Kastrati discovered that they had fired the busser when he arrived at Novita on March 6, 2019 to receive his final paycheck.

c.   On March 18, 2019, a bartender from Romania told Kastrati that Novita had fired her.  Fregonese and Yoshida had never discussed firing this bartender with Kastrati.

51.   Nor did Kastrati have the authority to discipline employees.  For example:

a.   When an Italian waitress arrived late on several occasions, Kastrati informed Yoshida.  Yoshida refused to reprimand this waitress.

b.   In or around late December 2018, Kastrati told Fregonese and Yoshida that a hostess and occasional manager who was friends with Yoshida had been excessively consuming alcohol, ignoring customers, and dancing at the hosting station while working.  In response to Kastrati's concerns, Fregonese sent Kastrati a letter on March 1, 2019 stating that, "[a]s a member of the management team, [this hostess was] allowed a glass of wine with her meal and an alcohol beverage of her choice while closing."  The letter also stated that "future staff concerns should be submitted in writing for impartial evaluation by the managing partners." The letter made clear that Kastrati was not a managing partner.

52.    In addition, Fregonese and Yoshida rarely sought Kastrati's input in making strategic decisions about the Restaurant.  For example, Fregonese and Yoshida excluded Kastrati from the process of creating a "service code" that contained guidance for employees on proper ways of conducting themselves while on duty.  On February 16, 2019, copies of the new service code appeared on the bar for each staff member to take.  Fregonese and Yoshida had not invited Kastrati to the numerous meetings to discuss the new service code or otherwise consulted Kastrati in drafting it.

<u>Fregonese and Yoshida Waste and Misappropriate Novita's Assets</u>

53.    On information and belief, Fregonese and Yoshida concealed financial information from Kastrati to cover up their waste and misappropriation of Novita's assets.

54.    As set forth above, based on the profit and loss statements that defendants provided Kastrati, Fregonese and Yoshida have reported a number of questionable expenses.

55.    For example, between July and December 2018, defendants reported having spent several thousands of dollars on travel expenses. On information and belief, Fregonese and Yoshida's work at Novita, a Restaurant, required no business travel. Fregonese and Yoshida live around the corner from Novita and walk to the Restaurant to work.

56.    During that same six-month period, defendants reported having spent over thousands of dollars on "uniforms." The following year, in 2019, Novita reported spending almost double that amount, again on "uniforms."  Although Novita changed its uniforms for staff in 2018, this was a one-time purchase; Novita would have no reason to purchase uniforms again the following year. Moreover, the uniforms that defendants purchased in 2018 cost less than the amount reported in 2018 and certainly less than the amount defendants purportedly spent the following year.

1141505 v1

57.     During 2019, defendants also reported having spent tens of thousands of dollars on repairs and maintenance, restaurant supplies, office supplies, meals, and travel. Kastrati is not aware of any basis for this level of spending.

58.     Furthermore, on information and belief, Fregonese and Yoshida have mispresented corporate profits to avoid paying Kastrati profit distributions to which he is entitled. Since October 2018, even though the restaurant's performance has improved, Kastrati has received three profit distributions totaling less than $5,000.

<u>Discrimination Against Non-Italian Employees and Customers</u>

59.     Fregonese and Yoshida repeatedly subjected non-Italian employees, including several Albanian staff members, to biased treatment.

60.     For example, as set forth above, between January and March 2019, the Restaurant fired two Albanian employees. On January 28, 2019, Fregonese and Yoshida directed Kastrati to fire his nephew, who is Albanian and from Kosovo. Kastrati's nephew had begun working at Novita as a waiter in May 2017.  Kastrati's nephew had quickly proven one of the Restaurant's best waiters and customers often asked for him.  Fregonese and Yoshida did not explain the reason behind terminating his employment other than by calling him an "asshole." After failing to convince Fregonese and Yoshida to change their minds, Kastrati told his nephew that the Restaurant had fired him on or about February 2, 2019.

61.     At the same January 28, 2019 meeting, Fregonese and Yoshida also told Kastrati to fire an Albanian employee from Albania.  This employee worked in the coat check room and had found the Novita job through an employment agency.  As directed, Kastrati told this employee that she was fired on or about February 3, 2019.

62.    In contrast, Fregonese and Yoshida repeatedly extended preferential treatment to the Italian employees.  For example, on or about February 10, 2019, Yoshida sent Kastrati a text message saying that the bussers had been underperforming and that the restaurant was becoming too casual.  Yoshida focused her criticism on the bussers rather than the waitstaff.  Most of the waiters at Novita are Italian; the Restaurant's bussers, however, are from Latin America.

63.    Yoshida also said on multiple occasions that Novita should hire more young, Italian waiters.

64.    The discriminatory culture worsened after after Kastrati's promotion to manager.  While all staff typically ate meals together during Kastrati's tenure, the Italian staff began eating separately from the non-Italian staff beginning in or around February 2019.  It was obvious that Novita defined staff according to their ethnicity, ancestry, and country of origin.

65.    In addition to the discriminatory conduct against staff, Yoshida made derogatory comments about customers based on their religion and ages.  Among other examples, on February 5, 2019, Yoshida told Kastrati that she wanted neither Jews nor "old farts" as patrons at Novita unless they arrived early in the evening.

<u>Novita's Discriminatory Treatment of Kastrati</u>

66.    Around the time Delpiano left Novita and Kastrati became a manager, in July 2018, Yoshida took a more active role in running the restaurant.  She became a regular presence at Novita, where she complained repeatedly about the bussers and about Kastrati.  Almost immediately after Kastrati acquired shares in the restaurant, Fregonese and Yoshida targeted Kastrati for discrimination and harassment because he is not Italian.

67.    In or around March 2018, Fregonese pressured Kastrati to legally change his first name from "Muhamet," a Muslim name, to "Mike."  Fregonese claimed that Kastrati should change his first name because, as a shareholder, the Restaurant would add Kastrati to the lease when Novita renewed its lease.  Fregonese told Kastrati that he was concerned that the Jewish owners of the building would not want the paperwork to include a Muslim name.

68.    In or around July 2018, Fregonese told Kastrati that he must purchase a new wardrobe because the way he dressed was not "Italian enough" for Novita.  Fregonese also said to Kastrati that Yoshida did not like the suits he wore to work because she believed they were not "Italian looking for her taste" or words to that effect.

69.    In addition, Yoshida said to Kastrati on multiple occasions that he would not be successful at Novita because he is not Italian, because he did not look Italian, and because of his "nasty" Eastern European accent.

70.    By way of example, in or around September 2018, Yoshida insisted that Kastrati wear a pair of white pants during his shift.  Kastrati objected because the pants were uncomfortable.  Yoshida began yelling at Kastrati.  She told Kastrati that he must look the "Italian part at Novita."  In response, Kastrati said that being Italian had no bearing on his work as a manager.  Yoshida said, in sum and substance, "You don't get it.  I never wanted you here.  You are not Giuseppe [Delpiano]."  Delpiano was born in Italy.

71.    Also, in or around September 2018, Kastrati's wife, sister-in-law, and other family members had dinner at Novita.  During their meal, Yoshida asked Kastrati's sister-in-law in a mocking manner if she had immigration papers allowing her to be in the United States legally.  As Yoshida knew, Kastrati's wife and her sister were born in the United States and therefore were

14

United States citizens.  Yoshida then said that she liked Kastrati's wife's "European" accent but found Kastrati's accent to be "nasty."

72.     In or around October 2018, Yoshida made additional biased comments about Kastrati's accent.  She said, in sum and substance, that Kastrati should have taken the finance job at Foresters Financial Services because he would not need to talk and no one would be forced to hear his accent.

73.     In or around November 2018, Yoshida complained that the restaurant did not have enough Italian waiters even though only one waiter was not Italian.  Yoshida also said that she wanted all the waiters and the manager (Kastrati, at the time) to be Italian.  Kastrati expressed concern about these comments to Fregonese and Yoshida.  Kastrati pointed out that even if these changes were appropriate, which they were not, they were unnecessary as the restaurant was flourishing and the online reviews were better than they had ever been.  Yoshida said to Kastrati, in sum and substance, "Mike [Kastrati], you just don't get it; I want to clean all this shit out."

74.     In December 2018, Yoshida ate at the restaurant almost every night.  She demanded that only Italian waiters serve her table.  She also made negative statements about Kastrati's accent during this period.  She said, in sum and substance, "can't you work on that accent, it sounds terrible" and "please stop talking to customers because your accent is disgusting."

75.     On December 31, 2018, in front of Kastrati's wife, Yoshida said about Kastrati, "he's just not Italian" and "his accent hurts my ears."

Escalating Hostile Work Environment

76.     In or around January 2019, Fregonese and Yoshida invited Kastrati to attend lunch at another restaurant.  They used this lunch as an opportunity to attack and humiliate him.

Among other comments, Yoshida told Kastrati that he should speak to the daytime manager because of her "wonderful English."  Yoshida also complimented the daytime manager because she effectively "nudg[ed] needy, old customers" to leave the restaurant and not linger.

77.    On or about February 5, 2019, Yoshida met with Kastrati at the restaurant. She again criticized Kastrati because he is not Italian, and said that, no matter what he did, he would not be successful because he was not Italian, did not speak the language, and did not understand the culture.  Yoshida said she was shocked that Kastrati had not visited Italy.  Yoshida told Kastrati that he was narrowminded, everyone other than "creepy Jews" could tell his "swarmy charm" was artificial, and he had too large of an ego, which was only "good for old Jews and old people." She also said that Kastrati earned too much money.  Kastrati asked her to "please stop" making biased comments against him.

78.    On or about February 7, 2019, Yoshida sent a text message to Kastrati setting different rules for Italian employees in communicating with customers.  She said that only Italian employees may say "buona sera" (which means "good evening" in Italian).  Yoshida also told Kastrati not to pretend to be Italian by treating customers "Soprano style."  She directed Kastrati not to hug customers nor to be too friendly.  To Kastrati's knowledge, she did not ask any employees other than Kastrati to follow these rules.

79.    On or about February 10, 2019, to Kastrati's knowledge, Yoshida and two other employees made discriminatory and derogatory comments about Kastrati at Novita.  They mocked Kastrati's accent.  They also said that Kastrati suffered from "cultural problems" and "cultural dishonesty" because he is Albanian and from Kosovo.  They further discussed that Kastrati supposedly did not understand the trends in New York City because he is from the "Eastern Bloc."  They called Kastrati an "asshole" and a "moron."  On information and belief,

16

Yoshida told the bartender working that day that she should "close [her] ears" because Yoshida was talking about Kastrati.

80.     In addition to the above examples of biased treatment and harassment, on February 14, 2019, Yoshida told an Italian waitress that Kastrati had "scum up [his] big penis."

81.     Kastrati complained to Fregonese on multiple occasions about Yoshida's ongoing unlawful harassment and discrimination, including in October 2018, in December 2018, and on or about February 10, 2019. On these occasions, Fregonese admitted that he was aware of Yoshida's misconduct, but told Kastrati that he needed to accept her mistreatment. He compared the working relationship to enduring the ups and downs of a marriage.

<u>Defendants Continue to Discriminate Against Kastrati and Retaliate Against Him</u>

82.     By letter dated February 28, 2019, Kastrati complained through counsel about defendants' unlawful discrimination against him.

83.     Immediately upon receiving this letter complaining about unlawful discrimination, defendants escalated their discrimination and began retaliating against Kastrati. Within an hour of receiving the letter on March 1, 2019, defendants demoted Kastrati. Fregonese told Kastrati that Kastrati was no longer a manager and nothing more than a "host." Fregonese also prohibited Kastrati from addressing staff as a manager and took away his responsibility for determining the staff schedule. Fregonese further admonished Kastrati not to speak to him anymore. Fregonese said that Kastrati should talk to his lawyer and that he would see him in court.

84.     In addition, also on March 1, 2019, Fregonese provided Kastrati with a letter informing him that Yoshida would be taking on a greater role in the day-to-day management of the restaurant. Kastrati understood this letter to mean that defendants were reassigning Kastrati's management duties to Yoshida.

85.     Kastrati's demotion to the position of host quickly took effect.  Fregonese and Yoshida told staff to communicate with them, and not Kastrati, about work schedules.  In addition, Fregonese and Yoshida stopped notifying Kastrati when they hired or fired employees after he complained about unlawful discrimination.  While Kastrati had never made hiring or firing decisions, before he complained, Fregonese and Yoshida had generally told Kastrati about staff changes, including when defendants had hired new staff or discharged employees and, on some occasions, had directed Kastrati to carry out their decision to fire employees.

86.     On March 1, 2019 and in the days and weeks thereafter, defendants engaged in other forms of retaliation, including soliciting negative feedback about Kastrati from other employees and directing staff to treat Kastrati like a pariah by ignoring him.

87.     Also, on or about March 1, 2019, Fregonese and Yoshida removed Kastrati's access to Novita's surveillance camera system and point of sales system by changing the passwords and not providing him with the new log-in information.  The point of sales system tracks and displays all sales that occur.

88.     Kastrati complained about the ongoing discrimination and retaliation via a letter from his lawyer dated March 14, 2019.  Kastrati identified as retaliatory the demotion and other conduct described above.  Kastrati asked defendants to refrain from further retaliation.

89.     Instead, defendants escalated the retaliation, harassment, and discrimination against Kastrati.  For example, in a letter from Novita's counsel dated March 26, 2019, defendants made a number of threats and a string of false accusations against Kastrati.  Specifically, defendants accused Kastrati of excessive alcohol consumption at work, giving free alcohol to customers, poor performance, and making inappropriate sexual overtures toward younger female employees.

1141505 v1

90.     Novita fabricated these claims.  Kastrati worked for the Restaurant for approximately 15 years.  During Kastrati's tenure, he never arrived at work intoxicated nor drank excessively at work.

91.     Also, defendants applied a different standard to Kastrati than other managers and staff.  In its March 26, 2019 letter, defendants criticized Kastrati for drinking on the job.  Yet, during Kastrati's tenure, Novita permitted employees to have as many as two drinks per night while at work.  Fregonese and other staff frequently drank at work.  On Sunday evenings, Yoshida often had dinner with friends at the Restaurant and urged the Italian waiters to sit with her and have drinks while working.

92.     Also, when Kastrati raised concerns about an employee drinking too much during her shift, Fregonese and Yoshida provided him with a letter stating that: "As a member of the management team[,] ] [this employee] is allowed a glass of wine with her meal and an alcohol beverage of her choice when closing."

93.     Further, Novita's allegation against Kastrati for purportedly providing complimentary alcohol to some customers is bogus.  Fregonese and Yoshida give away alcohol and food to numerous customers, including their architect and real estate agent.  Moreover, as a matter of practice, many of the regular customers at Novita received free alcohol and food.  Most staff are aware of which customers receive those benefits.

94.     Kastrati has never sexually harassed female employees.  Novita's letter dated March 26, 2019 was the first time anyone has accused Kastrati of sexually harassing female employees.  It was Fregonese and Yoshida who have created a sexually inappropriate environment. It is well known that they specifically hired female employees in their 20s for the purpose of

pressuring them to participate in group sex with Fregonese and Yoshida.  Several staff members have complained about this conduct.

Novita Fires Kastrati

95.     By email dated April 3, 2019, defendants made additional false allegations against Kastrati.  Defendants erroneously claimed that Kastrati's "alcohol consumption ha[d] grown increasingly pronounced and brazen."  Defendants went so far as to accuse Kastrati of driving home drunk.  This is untrue.

96.     Defendants also stated that they would not allow Kastrati to enter the Restaurant again until he provided them with "written assurances that [he] will not consume any alcohol while working, nor will [he] show up at work intoxicated."  To Kastrati's knowledge, defendants have not required other employees to provide such assurances and has not subjected anyone else to these standards.  Indeed, as described above, during Kastrati's employment, the Restaurant permitted employees to have two drinks during their shift in the evenings.  Before Kastrati had a chance to respond to this retaliatory request, defendants fired him.

97.     Two hours after defendants' April 3 email, Kastrati arrived at the restaurant for work at his scheduled start time.  Fregonese immediately fired Kastrati.  Fregonese said to Kastrati that he no longer worked at Novita.  With Kastrati's employment terminated, Kastrati left the restaurant and returned home.

98.     In addition, in early April 2019, defendants cut-off Kastrati's access to Novita's OpenTable account.  As a result, Kastrati cannot access any information about reservations at the restaurant.

99.     By email dated April 4, 2019, defendants attempted to revise what happened by email.  Defendants stated that Kastrati had neither been "been fired, nor demoted."  The email

20

also insisted that defendants' false allegations against Kastrati were not baseless and that video existed that captured Kastrati's misconduct.  Defendants, however, ignored Kastrati's requests for copies of video purportedly capturing his misconduct.

100.    Kastrati told defendants multiple times that Kastrati is ready, willing, and able to work.  Novita refused to allow Kastrati to do so.

101.    Kastrati's understanding is that on or about April 6, 2019, Yoshida and Fregonese told other employees during a staff-wide meeting that defendants had fired Kastrati.

102.    On information and belief, defendants have replaced Kastrati as manager with an Italian employee.

### Defendants Continue to Conceal Novita's Finances

103.    Since firing Kastrati, defendants have continued to hide Novita's records from Kastrati.

104.    On January 2, 2020, Kastrati requested that defendants provide him with access to Novita's financial records, including documentation regarding the questionable expenses on Novita's profit and loss statements, as well as records reflecting the Restaurant's revenue. Kastrati reminded defendants of their obligations under New York law to produce the requested documents when a shareholder makes such a request in good faith, and that investigation of corporate misconduct constitutes "good cause" for such a request.

105.    Defendants, however, refused to produce the requested documents.  On January 7, 2020, defendants accused Kastrati, without basis, of not acting in "good faith" in making his request for Novita's financial records. Defendants have, to date, failed to provide Kastrati with any financial information concerning the Restaurant beyond its profit and loss statements.

106.     Defendants have stopped providing Kastrati with Novita's profit and loss statements, even though he remains a shareholder. The most recent profit & loss statement that Kastrati received, at the end of August 2020, reflected Novita's purported profits through June 2020.

107.     Although defendants have concealed Novita's finances from Kastrati, on information and belief, Novita is performing well and turning a profit despite the COVID-19 pandemic.

108.     On information and belief, Novita has modified its business to provide take-out and outdoor seating with considerable success. In an article dated November 13, 2020, the New York Post lauded Novita's "elaborate" outdoor dining structure, which includes "a row of 12 transparent houses []," each of which seats four to eight guests at a time.[2]  NBC New York also praised Novita's outdoor setup in a segment that aired on October 29, 2020.[3]

109.     Based on information publicly available on Novita's OpenTable site, defendants' changes have been effective at retaining, if not growing, Novita's customer base.  The Restaurant's customer-facing OpenTable site states the number of reservations that have been made each day. During the pandemic, the OpenTable site for Novita regularly shows 60 or more bookings at the Restaurant each day.

---

[2]See https://nypost.com/2020/11/13/nyc-restaurants-bet-on-over-the-top-outdoor-dining-shelters-this-winter/

[3]See https://www.nbcnewyork.com/entertainment/the-scene/new-york-live/the-great-outdoors/2692934/

FIRST CAUSE OF ACTION
Title VII Race and National Origin Discrimination (Against Novita)

110.    Plaintiff repeats and realleges paragraphs 1 to 109 of this Complaint as if fully set forth herein.

111.    By the acts and practices described above, Novita has discriminated against plaintiff in the terms and conditions of his employment based on his race and national origin in violation of Title VII.

112.    Novita has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

113.    As a result of Novita's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

SECOND CAUSE OF ACTION
Race Discrimination Under Section 1981 (Against all Defendants)

114.    Plaintiff repeats and realleges paragraphs 1 to 113 of this Complaint as if fully set forth herein.

115.    By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of his employment in violation of Section 1981.

116.    As supervisors who were personally involved in and causally connected to Novita's discriminatory conduct, Fregonese and Yoshida are liable in their individual capacities under Section 1981.

117.    Defendants knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for plaintiff's statutorily protected rights.

23

118.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer economic damage, irreparable injury, emotional distress, reputational injury, and other compensable damages.

THIRD CAUSE OF ACTION
NYSHRL National Origin and Race Discrimination (Against All Defendants)

119.    Plaintiff repeats and realleges paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.    By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of employment on the basis of his race and national origin in violation of NYSHRL.

121.    As owners and managing partners of Novita, Fregonese and Yoshida are liable as employers. Fregonese and Yoshida are also liable as aiders and abettors, including for aiding and abetting  Novita's unlawful acts.

122.    Defendants acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

123.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

1141505 v1

FOURTH CAUSE OF ACTION
NYCHRL National Origin and Race Discrimination (Against All Defendants)

124.    Plaintiff repeats and realleges paragraphs 1 through 123 of this Complaint as if fully set forth herein.

125.    By the acts and practices described above, defendants have discriminated against plaintiff in the terms and conditions of employment on the basis of his race and national origin in violation of NYCHRL.

126.    As owners and managing partners of Novita, Fregonese and Yoshida are liable as employers. Fregonese and Yoshida are also liable as aiders and abettors, including for aiding and abetting Novita's unlawful acts.

127.    Defendants discriminated against plaintiff with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

128.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury, and other compensable damages.

FIFTH CAUSE OF ACTION
Retaliation Under Title VII (Against Novita)

129.    Plaintiff repeats and realleges paragraphs 1 to 128 of this Complaint as if fully set forth herein.

130.    By the acts and practices described above, Novita has retaliated against plaintiff for his protected complaints and opposition to unlawful employment practices in violation of Title VII.

1141505 v1

131.    Novita acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

132.    As a result of Novita's retaliatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

SIXTH CAUSE OF ACTION
Retaliation Under Section 1981 (Against All Defendants)

133.    Plaintiff repeats and realleges paragraphs 1 to 132 of this Complaint as if fully set forth herein.

134.    By the acts and practices described above, defendants have retaliated against plaintiff in the terms, conditions, and privileges of his employment for his opposition to unlawful practices in violation of Section 1981.

135.    As supervisors who were personally involved in and causally connected to Novita's discriminatory conduct, Fregonese and Yoshida are liable in their individual capacities under Section 1981.

136.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

137.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

1141505 v1

## SEVENTH CAUSE OF ACTION
### Retaliation Under NYSHRL (Against All Defendants)

138.    Plaintiff repeats and realleges paragraphs 1 through 137 of this Complaint as if fully set forth herein.

139.    By the acts and practices described above, defendants have discriminated against plaintiff for his opposition to unlawful employment practices in violation of NYSHRL.

140.    As owners and managing partners of Novita, Fregonese and Yoshida are liable as employers. Fregonese and Yoshida are also liable as aiders and abettors, including for aiding and abetting Novita's unlawful acts.

141.    Defendants acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

142.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## EIGHTH CAUSE OF ACTION
### Retaliation Under the NYCHRL (Against All Defendants)

143.    Plaintiff repeats and realleges paragraphs 1 through 142 of this Complaint as if fully set forth herein.

144.    By the acts and practices described above, defendants have discriminated against plaintiff for his opposition to unlawful employment practices in violation of NYCHRL.

145.    As owners and managing partners of Novita, Fregonese and Yoshida are liable as employers. Fregonese and Yoshida are also liable as aiders and abettors, including for aiding and abetting Novita's unlawful acts.

1141505 v1

146.    Defendants discriminated against plaintiff with willful or wanton negligence, or recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

147.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

<u>NINTH CAUSE OF ACTION</u>
<u>Petition for Judicial Dissolution Under BCL §1104-a(a)(1)</u>

148.    Plaintiff repeats and realleges paragraphs 1 through 147 of this Complaint as if fully set forth herein.

149.    By their acts and practices, including, but not limited to, preventing Kastrati from serving as a manager and employee of Novita, failing to treat Kastrati with equal dignity and respect, preventing Kastrati from accessing Novita's premises, and failing to disclose information regarding Novita's finances and operations, Fregonese and Yoshida have frustrated Kastrati's reasonable expectations as a shareholder. Fregonese and Yoshida's actions constitute shareholder oppression within the meaning of BCL § 1104-a(a)(1).

150.    Novita is a closely held corporation authorized to conduct business in New York State.

151.    Kastrati owns 20 percent of the shares of Novita.

152.    Because of Fregonese and Yoshida's oppressive actions, liquidation is the only feasible means by which Kastrati may reasonably expect to receive a fair return on his investment.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)     Dissolving Novita pursuant to BCL § 1104-a(a)(1);

(b)     Appointing a receiver or liquidator to take immediate possession of Novita's business and property, to wind up and liquidate such business and property as may be indicated or as the Court may direct, to pay from the assets the obligations to creditors, and to remit equally to the shareholders the remaining sums;

(c)     Declaring that the acts and practices complained of herein violate Title VII, Section 1981, the NYSHRL and NYCHRL.

(d)     Enjoining permanently restraining defendants from violating Title VII, Section 1981, NYSHRL and NYCHRL.

(e)     Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(f)     Awarding plaintiff damages to make him whole for all earnings he would have received but for defendant's discriminatory treatment, including, but not limited to, wages, commissions, bonuses, pension and retirement, health care coverage and other lost benefits including future lost wages and benefits;

(g)     Awarding plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

(h)     Directing defendants to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's statutory rights;

(i)     Awarding plaintiff damages to compensate for any adverse tax consequences;

(j)     Awarding pre-judgment interest;

1141505 v1

(k)      Awarding plaintiff attorneys' fees, costs and disbursements;

(l)      Awarding plaintiff such additional relief as the Court may deem just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
      January 19, 2020

                           VLADECK, RASKIN & CLARK, P.C.

By: _____/s_____
          Jeremiah Iadevaia
          Emily Miller
          565 Fifth Avenue, 9th Floor
          New York, New York 10017
          (212) 403-7300